2007 ME 82

**Alan P. HESS**

v.

**Rhonda M. HESS.**

Supreme Judicial Court of Maine.

Argued: Jan. 18, 2007.
Decided: July 5, 2007.

Peter B. Bickerman, Esq. (orally), 45 Memorial Circle, Verrill Dana, LLP, Augusta, for plaintiff.

Martha J. Harris, Esq. (orally), Paine, Lynch & Harris, P.A., Bangor, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Alan P. Hess appeals from a divorce judgment entered in the District Court (Bangor, *Murray, R., J.*). He contends that because his property became subject to an attachment ordered by a court in separate litigation after the date of the divorce judgment, the court should have amended the divorce judgment, or granted him a new trial. He also contends that the court erred in the allocation of debt and marital property, and in classifying the professional good will of his business as marital property. Rhonda M. Hess cross-appeals, contending, inter alia, that the court erred in limiting the duration of spousal support, and in determining that certain property was nonmarital. Finding no error or abuse of the court's discretion, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Alan and Rhonda Hess were married in 1974. During most of the marriage, Rhonda's primary job was caring for their four children[1] and their home. In 1998, while there were still three children at home, Rhonda returned to work as a part-time nurse. In 2004, she earned slightly more than $25,000. At the time of the hearing in 2005, she was expecting to earn approximately $40,000.

[¶ 3] In January of 1975, Alan began working as an investment sales broker for Means Investment Company in Bangor. He worked there until 1998, when he left the firm and started his own investment business, Hess Investments. Approximately ninety percent of his customers at Means Investment followed him to Hess

---

1. At the time of the hearing for the divorce, all four children had reached majority age.

Investments. Rhonda helped Alan with client development and the purchase of equipment for his leased office. At Hess Investments, Alan entered into an independent contractor agreement as a registered representative of an equity services company through which he trades stocks and bonds, sells mutual funds, and markets retirement plans. Also, Alan sells annuities through agency agreements with two life insurance companies. The parties and experts are in agreement that the tangible property of Hess Investments is worth approximately $21,500. Alan's net business income for 2002, 2003, and 2004 was $261,091, $266,403, and $252,852, respectively.

[¶ 4] During the course of the marriage, Alan and Rhonda made a variety of investments, along with other parties, in apartment buildings, restaurants, and hotels, some of which were profitable, others of which were not.[2] Although he would discuss the investments with Rhonda, Alan was the primary decision-maker for these investments. As of the date of the trial, the couple still had an ownership interest in several of the investments.

[¶ 5] At the time the divorce complaint was filed, Alan and Rhonda owned two parcels of real estate: the marital home, which was purchased in 1979, and a camp on Green Lake in Ellsworth.

[¶ 6] Alan filed a complaint for divorce in December of 2002. Rhonda filed an answer and counterclaim in January of 2003. While the divorce was pending, Alan purchased his parents' home on Heather Road in Bangor for $200,000.[3] Alan paid only $150,000 to his parents. There was conflicting testimony as to whether the $50,000 that Alan was not required to pay his parents was a loan, or whether it was intended as a gift of equity to Alan. The court found that it was intended as a gift to Alan.

[¶ 7] In its November 15, 2005, divorce judgment, the District Court made the following allocation of real and personal property.

| Alan | | Rhonda | |
|---|---|---|---|
| Hess Investments | $328,000 | Marital Home Equity | $150,000 |
| Means Investment Stock | 16,000 | Green Lake Camp equity | 173,000 |
| Hospitality Management, Inc. | 19,500 | Pontiac Bonneville (net value) | 4,000 |
| Heather Road Marital Property Equity | 40,000 | Pioneer IRA | 85,000 |
| Social Security Retirement | 155,000 | Pioneer IRA | 25,000 |
| Cadillac El Dorado | 6,500 | Maine State Retirement | 61,000 |
| GMC Yukon (net value) | 4,000 | Social Security Retirement | 55,000 |
| Commonwealth Plan | 38,500 | Commonwealth Plan | 54,500 |
| Total | $607,500 | Total | $607,500 |

[¶ 8] All personal property from the marital home was awarded to Rhonda, and

2. Several of these investments are the subject of the lawsuit brought by Alan's former employer and business partner, Paul Means, in which Alan is a named defendant, and in which Alan's property is subject to an attachment.

3. Alan subsequently sold the property.

all of the personal property in the Green Lake camp was awarded to Alan. The court also made the following allocation of debt.

| Alan | | Rhonda | |
|---|---|---|---|
| Down East Mortgage (Heather Road Property) | $151,760 | Wells Fargo Mortgage (Marital Home) | $ 70,015 |
| Bangor Savings Loan (Marital Home Equity [4]) | 20,833 | Wells Fargo Mortgage (Green Lake Property) | 62,760 |
| United Kingfield Bank | 10,812 | | |
| Means Lawsuit Debt | amount unknown & contingent | | |
| Total (known as of date of judgment) | $183,405 | Total (known as of date of judgment) | $132,775 |

[¶ 9] The court ordered that Alan pay Rhonda $1000 per week in general spousal support, to cease upon the death of either party, or when Rhonda reaches the age of sixty-five,[5] because she "has been awarded significant retirement assets as part of this Judgment and will be entitled to begin collecting such assets at that time, thereby reducing the need for ongoing spousal support." The court rejected Rhonda's claim that Alan had committed economic misconduct and found that Alan had "substantially complied with the payments required by the Interim Orders."[6]

[¶ 10] Alan and Rhonda both moved to amend the court's findings and judgment pursuant to M.R. Civ. P. 52(b), and Alan moved for a new trial pursuant to M.R. Civ. P. 59(a). Alan argued for a new trial because, subsequent to the divorce judgment, the Superior Court issued an order of attachment in the amount of $618,225 against the property of Alan and the property of a codefendant as a result of the pending suit brought by Alan's former employer and business partner.

[¶ 11] The court denied Alan's motion for a new trial, concluding that the attachment order "does not constitute the kind of newly discovered evidence which would support a new trial on this matter." On the motions to amend, the court reiterated its finding in the divorce judgment that the $50,000 from Alan's parents for the purchase of their Heather Road home was a gift to Alan individually. The court, however, did correct its math with respect to the amount held in escrow, finding that the marital proceeds from the sale of that home were $30,000 and not $40,000. The court modified the judgment to continue the spousal support past Rhonda's sixty-fifth birthday, but in the amount of only one dollar per year, "for the purpose of considering any future modification," given the speculative nature of future economic circumstances. The court declined to order life insurance to secure spousal support payments.

4. Alan used the proceeds from this loan to pay Rhonda the support and fees ordered by the court in its interim order.

5. Rhonda was fifty-one years old at the time of the divorce.

6. Rhonda alleges that during the pendency of the divorce, Alan failed to put money into an account from which household bills were paid, and actually withdrew money from that account. Alan admitted that he stopped putting money into the account, but he did continue to pay household bills.

[¶ 12] Alan appealed, and Rhonda cross-appealed.

## II. DISCUSSION

### A. Alan's Appeal

#### 1. Subsequent Attachment on Property and Allocation of Contingent Debt

■ [¶ 13] Alan contends that the attachment ordered against his property after the entry of the divorce judgment constitutes newly discovered evidence, and that the allocation of that debt in its entirety to Alan is inequitable.

■ [¶ 14] Alan first argues that the court abused its discretion by failing to grant a new trial. "We review the denial of a motion for a new trial for abuse of discretion." *Chiapetta v. Lumbermens Mut. Ins. Co.*, 583 A.2d 198, 203 (Me.1990). "New trials based on newly discovered evidence are disfavored and granted only upon convincing proof." *Id.* Although an attachment can be issued pursuant to M.R. Civ. P. 4A(c) only on "a finding that it is more likely than not that the plaintiff will prevail at trial in an amount which at least equals the amount sought to be attached," *Schneider v. Cooper*, 687 A.2d 606, 608 (Me.1996), at the time of the divorce judgment, the trial court was aware of the pending litigation in which Alan and his brother were codefendants, and that the plaintiff in that case was seeking more than three million dollars. Accordingly, the court acted within its discretion in refusing to grant a new trial or amend its judgment based on the subsequent attachment. *See Chiapetta*, 583 A.2d at 203.

■ [¶ 15] Alan further argues that the court abused its discretion in assigning to him the entire contingent debt involved in the lawsuit in which the attachment was made. "We review the division of marital property and debt for an abuse of discre-

tion." *Bonville v. Bonville*, 2006 ME 3, ¶ 9, 890 A.2d 263, 266. "In a proceeding for a divorce, . . . the court shall set apart to each spouse the spouse's property and shall divide the marital property in proportions the court considers just after considering all relevant factors . . . ." 19–A M.R.S. § 953(1) (2006). The statute does not require that all property, including marital debt, be divided evenly, only that the division must be "just" considering the parties' circumstances. *Carter v. Carter*, 2006 ME 68, ¶ 14, 900 A.2d 200, 203–04.

[¶ 16] The court assigned to Alan the contingent debt based on Alan's alleged wrongdoing. It otherwise divided marital property evenly, in an equitable way, and Alan retained possession of all of the couple's investments and profit-making property. The court acted within its discretion in declining to reallocate the marital debt. *See Tibbetts v. Tibbetts*, 2000 ME 210, ¶ 10, 762 A.2d 937, 940.

#### 2. Good Will Derived from Alan's Investment Business

■ [¶ 17] Alan also contends that the court erred by classifying good will derived from his investment business as divisible marital property, arguing that nearly all of the intangible value of Hess Investments consists of personal good will attributable solely to him, and that that good will cannot be considered as divisible marital property. Alan urges us to adopt two concepts of good will: "enterprise good will," which is readily transferable and, thus, can be divisible marital property, and "personal good will," which is inextricably linked to an individual and, therefore, not divisible marital property. *See May v. May*, 214 W.Va. 394, 589 S.E.2d 536, 541–42 (2003). On the evidence presented to the court in this case, however, we find it unnecessary to adopt either concept of good will.

[¶ 18] Both Alan's expert and Rhonda's expert testified that a large portion of the value of Hess Investments stems from good will, and both experts assigned a value to the business, using an income as well as a market approach to calculate the value. Although they had different opinions as to what Alan could expect to receive upon transferring that business, both experts testified that the good will of the business had substantial value that could be quantified and realized from a sale of the business. After discussing the different approaches of each of the two experts who testified as to the valuation of Hess Investments, the District Court expressly found "the approach, methodology and factors utilized by [Rhonda's expert] more reliable in establishing the fair market value for Hess Investments, and thereby adopt[ed] that opinion of value as the finding of value in this case for Hess Investments."

[¶ 19] The court's finding that the intangible assets of Hess Investments, including the company's good will, are transferable, and can be valued as divisible marital property, is supported in the record, and the court did not err in concluding that the good will value of Alan's business is a marital asset.

**B. Rhonda's Cross–Appeal**

**1. Gift to Alan for the Purchase of Real Property**

■ [¶ 20] Rhonda argues that the court erred by determining that the $50,000 in equity given to Alan by his parents toward the purchase of the Heather Road property was a gift to Alan alone and, therefore, nonmarital property. Pursuant to 19–A M.R.S. § 953(3) (2006), "[a]ll property acquired by either spouse subsequent to the marriage ... is presumed to be marital property." That presumption, however, can be overcome by showing that the

"[p]roperty [was] acquired by gift, bequest, devise or descent." 19–A M.R.S. § 953(2)(A) (2006). The determination of whether the $50,000 that Alan did not pay toward the purchase of the home from his parents was a "gift," pursuant to 19–A M.R.S. § 953(2)(A), is a question of fact that we review for clear error. *See Spooner v. Spooner,* 2004 ME 69, ¶ 7, 850 A.2d 354, 358.

[¶ 21] At trial, there was conflicting evidence as to the intention of Alan's father in having Alan pay only $150,000 toward the $200,000 purchase price of the Heather Road property, including several notations on Alan's loan application that the $50,000 down payment is a "gift of equity." The court found that the property was a gift to Alan alone, as reflected in the mortgage documents, and that it therefore, remained Alan's nonmarital property. The court's finding that Alan overcame the presumption that the $50,000 had become marital property is supported by the evidence. *See Spooner,* 2004 ME 69, ¶ 7, 850 A.2d at 358.

**2. Spousal Support**

**a. Reduction of spousal support to one dollar per year after Rhonda turns sixty-five.**

■ [¶ 22] Although the court did grant Rhonda's post-trial motion in part, by continuing spousal support beyond her sixty-fifth birthday, Rhonda contends that the court erred by reducing the $1000 per week award of general spousal support to one dollar per year when Rhonda turns sixty-five. She argues that the court overly speculates that she would be receiving substantial retirement benefits at that time, including Social Security benefits. A trial court's determination of spousal support pursuant to 19–A M.R.S. § 951–A (2006) is reviewed with deference. *Brad-*

*shaw v. Bradshaw*, 2005 ME 14, ¶ 13, 866 A.2d 839, 843. Spousal support must be "reasonable both in amount and in the method of payment giving regard to the situation, *both at present and for the foreseeable future* of both spouses." *Klopp v. Klopp*, 598 A.2d 462, 464 (Me.1991) (quotation marks omitted).

[¶ 23] One of the statutory factors that the court must consider in calculating an award of spousal support is "[t]he provisions for retirement ... benefits of each party." 19–A M.R.S. § 951–A(5)(G). A limit on the duration of spousal support is clearly contemplated by 19–A M.R.S. § 951–A(2)(A), which creates rebuttable presumptions regarding the number of years a court may order general spousal support based on the length of the marriage. Although neither rebuttable presumption is applicable in this case involving a thirty-one-year marriage, the court acted within its discretion when, pursuant to 19–A M.R.S. § 951–A(3), it limited the duration and the amount of the spousal support.

[¶ 24] Rhonda's argument that her future retirement benefits are too speculative to support a durational limitation on spousal support is unpersuasive. As well as her entitlement to Social Security benefits,[7] Rhonda is a member of the Maine State Retirement System, and the court awarded that entire benefit to her, the present value of which is more than $61,000. Rhonda also received a Pioneer Investments IRA in her name, with a value of nearly $25,000; the entirety of a Pioneer Investments IRA in Alan's name worth $84,600; and $54,500 from Alan's Commonwealth IRA. The court acted within its discretion when it ordered that Rhonda's award of spousal support be time-limited, based on her foreseeable, calculable, future receipt of retirement benefits.

b. Termination of spousal support upon the death of either party, not secured by life insurance.

[¶ 25] Rhonda also contends that the court abused its discretion by concluding that spousal support should terminate on the death of either party, and that such support need not be secured by life insurance in the event of Alan's death. Again, we review a trial court's determination of spousal support pursuant to 19–A M.R.S. § 951–A(5) "with great deference." *Bradshaw*, 2005 ME 14, ¶ 13, 866 A.2d at 843.

[¶ 26] By statute, an award of spousal support is discretionary with the trial court, and it need not survive the death of either party. The statutory presumption is that spousal support will terminate upon the death of either party, unless the court's order awarding support provides otherwise.[8] 19–A M.R.S. § 951–A(8). If

---

**7.** Rhonda further contends that the court erred in its findings of the value of potential Social Security benefits to her given the speculative nature of those benefits. Rhonda notes that she may not receive any Social Security benefits under federal law if she were to remarry. We have "upheld the principle that a court may consider Social Security benefits as a relevant factor in its equitable division of property" but have concluded "a court may not attribute a present value to the benefits and may not distribute marital property in a manner that attempts to proportionately offset anticipated Social Security bene-

fits." *Bradbury v. Bradbury*, 2006 ME 26, ¶ 6, 893 A.2d 607, 609. In this case, however, the parties stipulated to include the amount of Social Security in the court's calculation of their marital property, and although they disagreed as to the value of Rhonda's benefit, the court used the value of benefits provided by Alan's expert. Rhonda provided no other figures, and the court did not err in honoring an agreement reached by the parties. *See Cloutier v. Cloutier*, 2003 ME 4, ¶ 9, 814 A.2d 979, 983.

**8.** Pursuant to 19–A M.R.S. § 951–A(8) (2006):

the court does determine that the obligation survives the death of either party, then "[t]he court may also order the obligated party to maintain life insurance or to otherwise provide security for the payment of spousal support." 19–A M.R.S. § 951–A(7). That an award of spousal support *may* be secured by life insurance, does not mean that a court is *required* to order that life insurance secure such support. *See Bryant v. Bryant,* 411 A.2d 391, 395 (Me. 1980). Accordingly, the court did not abuse its discretion in determining that spousal support should terminate upon the death of either spouse, and that the obligation need not be guaranteed by life insurance.

c. Arrearages and economic misconduct.

[¶ 27] Rhonda's contentions as to arrearages she claims are owed to her by Alan, and that Alan has committed economic misconduct, are unpersuasive.

C. Equity of Division of Marital Property and Debt

[¶ 28] Finally, both parties contend that the District Court's division of property and allocation of debt create a substantial inequity. "We review the division of marital property and debt for an abuse of discretion." *Bonville,* 2006 ME 3, ¶ 9, 890 A.2d at 266. When viewed in the aggregate, the divorce judgment has not resulted in a failure of equity.

The entry is:

Judgment affirmed.

An order awarding, denying or modifying spousal support may provide that the award survives the death of the payee or payor, or both. Unless otherwise stated in the order awarding spousal support, the obligation to make any payment pursuant to this section ceases upon the death of either the payee or the payor with respect to any payment not yet due and owing as of the date of death.