2009 ME 49

**Carla CATLETT**

v.

**David CATLETT.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Feb. 26, 2009.

Decided: May 12, 2009.

Scott G. Hunter, Esq., Solman & Hunter, Caribou, for David Catlett.

Richard L. Currier, Esq., Currier & Trask, P.A., Presque Isle, for Carla M. Catlett.

Panel: CLIFFORD, and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

MEAD, J.

[¶ 1] David Catlett appeals from a divorce judgment entered by the District Court (Presque Isle, *O'Mara, J.*). David argues that the court erred in: (1) finding that the Chapman Farm real estate was nonmarital; (2) finding that Carla did not engage in economic misconduct; (3) dividing the marital property; (4) determining Carla's general spousal support award; and (5) adopting Carla's proposed divorce judgment. Because the court's findings on the Chapman Farm and economic misconduct were not in error, and the court properly applied 19–A M.R.S. § 953 (2008) when dividing the marital property, and 19–A M.R.S. § 951–A (2008) when determining spousal support, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Carla and David Catlett were married on November 16, 1976, and Carla filed for divorce on November 14, 2006, citing irreconcilable marital differences. At the time of the court's judgment, Carla was fifty-three years old and David was fifty-one years old. The couple has two grown children.

[¶ 3] Carla and David met in Maine when David was stationed in Ashland as a radar technician for the United States Air Force. For most of the couple's marriage, David served in the Air Force. They lived in a variety of states, as well as overseas. Carla, who has little education beyond high school, was a homemaker and the primary caretaker of the couple's children. She also held a variety of part- and full-time entry-level positions. Near the end of his tenure with the military, David obtained a bachelor's and master's degree in Business Administration, while continuing to work full-time. During this time, the couple enjoyed a comfortable middle-class lifestyle.

[¶ 4] In 1998, after twenty-two years in the military, David retired, having obtained the rank of Chief Master Sergeant. David began working for Raytheon Training Systems Company/L–3 Communications in Texas, and earned a second master's degree in Science and Marketing Research. In 2000, David left L–3 Communications, and he and Carla started a successful business, Biz Growth Associates. Carla performed office duties and was in charge of billing, answering the phone, and coordinating meetings, while David made all the management decisions. The couple resided in Mississippi and Texas during this time.

[¶ 5] In the summer of 2002, the couple relocated from Texas to Presque Isle, so that their youngest child could attend the University of Maine at Presque Isle, and Carla could be near her elderly parents. Upon their return to Maine, the couple purchased a residence at 14 Pleasant Street, Presque Isle. They resided in this house while saving money to finance the construction of a new home on property located in Chapman consisting of eighty acres and a pre-existing home. Carla's parents had conveyed this property,

known as the Chapman Farm, to Carla and David in 1997, reserving a life estate to remain in effect until Carla's parents were unable to reside at the home.[1] In 2003, David and Carla purchased additional residences at 10 and 12 Pleasant Street, Presque Isle. The home at 12 Pleasant Street was torn down and the 10 Pleasant Street property was used as a rental property until the end of 2006.

[¶ 6] Although Biz Growth was relocated to Maine, the company's clients remained located outside of New England. David spent most of his time away from Maine and Carla, spending 311 days in 2003, and 331 days in 2004 on the road. He would send his paycheck to Carla, who would deposit the money into the couple's joint banking accounts. Carla used money from these accounts for her day-to-day living expenses in Maine. She continued to work for Biz Growth part-time until October 2005.

[¶ 7] In October 2005, David returned to L–3 Communications, in Texas, taking a position as the director of marketing research. He continues to work for L–3 Communications in this capacity. Between October 2005 and August 2007, Carla was not employed. In August 2007, she took her current job with Mac Gray services, and works approximately twenty to twenty-five hours per month collecting and depositing money from laundry machines on college campuses. From October 2005 until the time of the divorce, Carla resided in Maine, in the couple's home at 14 Pleasant Street, and David resided in Texas in a rented apartment.

[¶ 8] Although David and Carla lived in different states, they continued to file joint income tax returns, and reported a gross income of $172,261 in 2006, and $220,933 in

2007. David also consistently sent Carla $2500 per month, and sent his daughter $1000 per month to cover her tuition and rent.

[¶ 9] In December 2005, David conveyed his interest in the Chapman Farm to Carla by quitclaim deed. In March 2006, David conveyed his interest in the 14 Pleasant Street residence to Carla in a similar manner. The deed for 10 and 12 Pleasant Street has always been in Carla's name only.

[¶ 10] Upon their daughter's graduation from college in the spring of 2006, David discontinued his monthly payment to her, but continued to pay Carla $2500 per month. Carla requested that David send her $3500 per month, but David declined. At this point, Carla felt it was "time to see a lawyer."

[¶ 11] On November 14, 2006, Carla filed for divorce. At the interim hearing held on May 25, 2007, Carla testified that her expenses were approximately $2100, and that David had been sending $2500 monthly. The court's order pending a final hearing found that David had been directly paying many of Carla's expenses since the time of the couple's separation in October 2005, and that her actual monthly expenses exceeded $2500. David was ordered to pay $3500 per month in interim spousal support. He has made those payments as ordered.

[¶ 12] A final hearing was held on April 14 and 18, 2008. At the end of the hearing, the parties presented the court with proposed judgments. On May 2, 2008, the court entered its final judgment.

A. Division of Property

[¶ 13] The court valued and divided the marital property as follows:

---

1. Carla's father passed away on October 25, 2005. Her mother was still residing in the home at the time of the final hearing.

### 1. Real Property

[¶ 14] The property located at 14 Pleasant Street was not subject to any mortgage debt and was valued at $48,000. The court found this real estate to be marital property and awarded it to Carla.

[¶ 15] The properties located at 10 and 12 Pleasant Street were not subject to any mortgage debt. The property at 10 Pleasant Street was valued at $40,000, and the lot at 12 Pleasant Street was valued at $10,000. The court found that Carla was attempting to sell these properties, and the real estate was marital. This real estate was awarded to Carla.

[¶ 16] With regard to the Chapman Farm, the court found that "upon the transfer from [Carla's] parents to the parties jointly this property became marital property, without restriction." The court found the Chapman Farm to be nonmarital, however, stating, "upon the transfer from [David] to [Carla], at the time when the parties were living apart, [David] surrendered his marital interest in the real estate, without restriction." The Chapman Farm was characterized as Carla's nonmarital property, and was assigned no monetary value.

### 2. Personal Property

[¶ 17] The total value of the personal property awarded to Carla including her two cars, bank accounts, and household items located in Maine, and half of the couple's 2007 tax refund, was $21,100.

[¶ 18] The total value of the personal property awarded to David including his car, bank accounts, kayak in Maine, and household items located in Texas, and half of the couple's 2007 tax refund, was $130,247.

### B. Retirement and Health Benefits

[¶ 19] The court awarded Carla her retirement account valued at $4200, and David his retirement account from L-3 Communications. Carla was also awarded half of David's military retired pay ($1100 per month), and David was ordered to continue to pay for Carla's health insurance as provided by the military.

### C. Other

[¶ 20] The court ordered David to pay Carla $30,000, "in order to create a just division of marital property."

### D. Spousal Support

[¶ 21] The court ordered David to pay $3500 per month in general spousal support and to assign Carla a life investor policy to satisfy his support obligations after his death. The court based this award on the length of the marriage, David's ability to pay, the age of the parties, the parties' employment and income history and potential, education and training, health and disabilities, standard of living, Carla's contributions as a homemaker and to David's education, and Carla's ability to be self-supporting.

[¶ 22] Among other things, the court found that David "clearly demonstrated the ability to pay spousal support to Carla.... In 2007, [David's] wages, military retirement, and disability totaled in excess of $215,000. [He] is on a similar track this year." "[Carla's] employment potential is unclear, ... [she] suffers from a variety of health issues including depression, osteoarthritis, obesity, anxiety, hypertension, insomnia, fatigue, fibromyalgia and tension headaches." "[Carla] does not possess the education, training or skills to be self-supporting. Her emotional and physical health impair her ability to find gainful full-time employment." Thus, the court found, "it is clear [Carla] has an unmet

financial need which [David] is able to meet. An award of $3500 in *general spousal support* will allow [Carla] to maintain a reasonable standard of living without significant economic impact on [David's] lifestyle."

[¶ 23] The court found no economic misconduct.

[¶ 24] David moved for additional findings of fact. On June 1, 2008, the court issued additional findings of fact as to Carla and David's living expenses, Carla's standard of living, the property at 10 and 12 Pleasant Street, Carla's emotional and physical health, and economic misconduct. No additional findings on the division of property were made.

[¶ 25] David timely appealed this judgment.

## II. DISCUSSION

### A. Factual Findings

#### 1. Chapman Farm

[¶ 26] The court's determination of the marital and nonmarital character of property is a question of fact reviewed for clear error. *Coppola v. Coppola*, 2007 ME 147, ¶ 14, 938 A.2d 786, 791. As long as there is competent evidence in the record, the court's factual findings on marital and nonmarital property will stand. *Id.*

[¶ 27] The record here contains sufficient evidence to support the court's finding that the Chapman Farm is Carla's nonmarital property because the transfer from David to Carla resulted in the Chapman Farm being property Carla "acquired by gift" subsequent to the marriage. 19–A M.R.S. § 953(2)(A). That evidence includes the fact that David executed a lawful conveyance (a quitclaim deed with covenants), in which he divested all his right, title, and interest in the Chapman Farm,

thus demonstrating his clear intent to abandon any interest in the Chapman family homestead. At the time of the conveyance, in December 2005, David and Carla were living separate lives—David in Texas, and Carla in Maine. Reconciliation was unlikely and, in fact, never occurred. The act of conveyance by David to Carla, during a period of separation that continued unabated until the divorce, supports the conclusion that David intended the Chapman Farm property to be Carla's alone.

[¶ 28] David's intent to relinquish his marital interest in the Chapman Farm is further supported by an October 2005 email in which David authorized Carla to remove his name from this property. In the email, which was sent from Texas, David states

> I mean no harm to the farm, to Alan, to your father, to your mother, to you, to our children, or to anybody else, or to deny anybody of anything. To reassure you of that, go to the lawyer and have my name removed from all the property in Maine. That includes all of the farm.... Nothing in Maine should be left in both of our names. If you need me to sign something saying that I agree to release all property rights, have a lawyer draw that up and send it along.

Two months later, David conveyed his interest in the Chapman Farm to Carla. The email, followed closely by the conveyance of David's interest to Carla, support the finding that it was David's clear intent to surrender any interest in the Chapman Farm.

[¶ 29] Finally, there is no dispute that the Chapman Farm, which belonged to Carla's parents before their conveyance of the property to Carla and David, was to remain in Carla's side of the family. The gift of this property was occasioned by a desire on the part of Carla's parents to have the homestead owned and occupied

by members of their family. David's email and quitclaim deed clearly bespeak a conscious decision to respect Carla's parents' wishes. Because he anticipated that he would no longer be part of Carla's family, David intentionally transferred all of his right, title, and interest (including marital interest) in Carla's family homestead to her.

[¶ 30] David's conveyance of his interest in the Chapman Farm to Carla, at a time when the couple was living apart, and after David expressed a desire to have his name removed from the property, coupled with the fact that the property was Carla's family homestead, support the court's finding of the Chapman Farm as nonmarital.

### 2. Economic Misconduct

[¶ 31] "A court's finding that a party to a divorce did or did not engage in economic misconduct is reviewed for clear error." *Peters v. Peters,* 1997 ME 134, ¶ 25, 697 A.2d 1254, 1261; *see also Quin v. Quinn,* 641 A.2d 180, 181 (Me.1994). The court made an initial finding that neither party had engaged in economic misconduct, and further found that David

> presented no evidence whatsoever that [Carla] spent marital funds in an inappropriate manner. Money did come out of the parties' accounts and money went into the parties' accounts. Some of this was the same money moving between accounts. While [David] states that he does not know where all the money went, this is not tantamount to evidence of economic misconduct.

[¶ 32] The record shows that the bank accounts at issue were joint accounts, both David and Carla had access to these accounts, and David permitted Carla to access these accounts. While Carla may not

have a good recollection as to how the money was spent, there was no evidence that she spent the money in an inappropriate manner. Any economic impact Carla's spending may have had was at most marginal. The couple was still able to cover all their expenses, including the maintenance of three homes in Maine and an apartment in Texas, and provide financial support to their two children.[2]

[¶ 33] The court did not err in finding that Carla did not engage in economic misconduct.

### B. Division of Marital Property

[¶ 34] The division of marital property is reviewed for abuse of discretion. *Brown v. Habrle,* 2008 ME 17, ¶ 13, 940 A.2d 1091, 1095. "In a divorce proceeding, property of each spouse is set aside to that spouse, and the marital property is divided in proportion to what is just and equitable after consideration of all relevant factors" set forth in 19–A M.R.S. § 953(1)(A)-(C). *Id.* Specifically, the court should consider "[t]he contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; [t]he value of the property set apart to each spouse; and [t]he economic circumstances of each spouse at the time the division of property is to become effective." 19–A M.R.S. § 953(1)(A)-(C). The division need not be even, but must be "just" considering the parties' circumstances. *Id.; Brown,* 2008 ME 17, ¶ 13, 940 A.2d at 1095.

[¶ 35] The judgment as a whole demonstrates the court's consideration of the contribution of each party to the acquisition of the property, including the contribution of Carla as the homemaker, the

---

**2.** According to David's financial statement, he spent approximately $12,000 per year on his children.

value, or inability to value, the nonmarital property, and the economic circumstances of each spouse at the time of the division of the property. 19–A M.R.S. § 953(1)(A)-(C). Because a proper consideration of all the factors occurred, and the award is essentially just, the court did not abuse its discretion in dividing the marital property.

## C. Spousal Support

[¶ 36] General spousal support provides "financial assistance to a spouse with substantially less income potential than the other spouse so that both spouses can maintain a reasonable standard of living after the divorce." 19–A M.R.S. § 951–A(2)(A). In determining a spousal support award, the court must consider sixteen enumerated factors and "[a]ny other factors the court considers appropriate." 19–A M.R.S. § 951–A(5)(A)–(Q). The award of spousal support is left within the sound discretion of the trial court. *Carter v. Carter,* 2006 ME 68, ¶ 19, 900 A.2d 200, 204. Although the court is required to consider the standard of living prior to the divorce, 19–A M.R.S. § 951–A does not mandate that either party be guaranteed the same standard of living he or she enjoyed prior to the divorce. *Id.* ¶ 20, 900 A.2d at 204–05. An award of spousal support pursuant to 19–AM.R.S. § 951–A is reviewed with deference. *Hess v. Hess,* 2007 ME 82, ¶ 22, 927 A.2d 391, 396.

[¶ 37] The court found that during the couple's separation, when Carla was receiving $3500 in interim support from David, her income was totally consumed by her expenses. After the divorce, Carla will have the additional expenses of real estate taxes on three Maine properties, and taxes on both the spousal support award and military retirement. Based on these new expenses, and the fact that Carla has limited savings and is unable to generate significant income from employment due to her health, there is substantial evidence to support the court's general spousal support award of $3500 per month.

## D. Proposed Judgment

[¶ 38] We have stated that "fact-finding can be aided by parties submitting and trial courts considering and utilizing, where appropriate, draft findings of fact offered by either side. The key question is whether the court findings reflect the application of judgment by the court, and not simply one of the parties." *In re Marpheen C.,* 2002 ME 170, ¶ 7, 812 A.2d 972, 974.

[¶ 39] There are notable differences between Carla's proposed judgment and the judgment entered, including the court's refusal to award reimbursement support, and its reduction of Carla's proposed spousal support award from $5000 to $3500 per month. Although much of the proposed judgment and court judgment are the same, the court adjusted Carla's findings and added statements, "making it evident that the resulting judgment is the result of the application of independent judicial thought to the process of making fact-findings and conclusions." *Id.*

[¶ 40] The court therefore did not err in adopting Carla's proposed judgment.

The entry is:

Judgment affirmed.